

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-13-00560-CR

Nico Allen-Antonio **COGDILL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 18th Judicial District Court, Johnson County, Texas
Trial Court No. F45973
Honorable John Edward Neill, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Catherine Stone, Chief Justice
    Sandee Bryan Marion, Justice
    Marialyn Barnard, Justice

Delivered and Filed:  September 17, 2014

AFFIRMED

A jury convicted appellant Nico Allen-Antonio Cogdill of capital murder.  The trial court sentenced Cogdill to life imprisonment without the possibility of parole.  On appeal, Cogdill contends: (1) the evidence is insufficient to support his conviction; and (2) the trial court erred in refusing to admit into evidence certain testimony.  We affirm the trial court's judgment.

### BACKGROUND

The evidence establishes Cogdill, whom the evidence suggested was a prospective member of the Aryan Brotherhood, spent an evening with Jeremy "Bounce" Bukowski, a member of the

Aryan Brotherhood, and Isaac "Rooster" Milne at a trailer house. The men talked about their past criminal exploits, including Cogdill's history of thefts and burglaries. Eventually, Bukowski told Cogdill about a planned burglary that had been approved by Bukowski's supervisor in the Aryan Brotherhood, Richard Ringley. The plan involved breaking into a trailer house owned by Rick Warren — a forty-nine-year-old invalid. Bukowski and his girlfriend had lived with Mr. Warren, but were asked to leave when Mr. Warren suspected they were stealing from him. Bukowski asked Cogdill if he would like to participate in the burglary and Cogdill agreed. According to Cogdill, Bukowski said no one would get hurt in the course of the burglary.

As agreed, Bukowski, Milne, and Cogdill met later in the evening and drove to Mr. Warren's residence. According to Cogdill's written statement, when the men arrived at Warren's residence, Bukowski altered the plan, stating they would kill Mr. Warren and then rob him. Bukowski allegedly told Cogdill he "couldn't have loose lips running around here" and Cogdill "would be shot" if he told anyone. According to Cogdill, Bukowski then asked Milne to pull a shotgun from the back of the vehicle. The three men approached Warren's trailer with a crescent wrench carried by Milne and the shotgun carried by Bukowski. Cogdill claimed Bukowski again threatened him, saying both Cogdill and his family would be shot if he backed out.

Mr. Warren was asleep in his bedroom with the television on. Cogdill claimed he tried to avert the murder, saying "we ain't got to do this, he's asleep." Bukowski allegedly told Cogdill that if he refused to participate then "two bodies [are] going to get it instead of one." Cogdill stated Milne then handed him the wrench and he entered the bedroom; Bukowski's shotgun was still pointed at him. Cogdill told law enforcement that as he stood over Mr. Warren he inadvertently roused him when the wrench he held brushed against Mr. Warren's arm. According to Cogdill, when Mr. Warren woke up, Cogdill struck him with the wrench "less than five times." Milne then began punching Mr. Warren and Cogdill dropped the wrench. Milne picked up the wrench and

continued beating Mr. Warren. Cogdill said the men then gathered items from the trailer house — a Fender guitar, a laptop, and television set — and left.

Around the time the men left, Mr. Warren's sister, Michelle Adams, who lived approximately twenty yards from her brother's trailer house, heard her dog barking. She went over to her brother's house and found the front door locked, which was unusual. Believing something was wrong, she ran back to her house to alert her husband. As she was walking back to her house, she heard "banging from the back door" of her brother's trailer house. When she ran around to the back of the trailer she saw that the back door, which had been screwed into place from the outside, was "barely hanging there." Ms. Adams said she saw two shadows running away from the trailer. When she looked inside the trailer she saw her brother face down in his own blood. Having already called 911, Ms. Adams performed CPR on her brother, but she said she knew he was already dead.

When she was subsequently interviewed by law enforcement, Ms. Adams told them about Bukowski and his girlfriend. Ms. Adams believed Bukowski might have been involved because of the eviction issue, among other things. Later that day, police pulled over Bukowski for a traffic violation. In Bukowski's car, they found Mr. Warren's laptop. Bukowski was arrested. Police later found Mr. Warren's guitar and television in a trailer rented by Bukowski. Bukowski gave a voluntary statement, implicating Milne and Cogdill in the murder of Mr. Warren.

Cogdill ultimately turned himself in to the authorities. In a videotaped interview taken prior to his written statement, Cogdill insisted for more than an hour he never hit Mr. Warren. However, after a detective confronted Cogdill with an e-mail Cogdill had prepared to send to the Cleburne Times Review, an e-mail in which Cogdill admitted he had swung the wrench and grazed Mr. Warren's shoulder, Cogdill admitted to striking Mr. Warren. In the e-mail, Cogdill also claimed the three men had always planned to "knock out" Mr. Warren if he was awake when they

entered his trailer. Later, when asked again where he struck Mr. Warren, Cogdill gestured toward his own head.

A detective, who either observed or conducted interviews with all three suspects, testified Bukowski and Milne contradicted Cogdill's version of the events. However, as one detective testified, Cogdill consistently stated Bukowski and Ringley threatened him multiple times, during and after the murder. Cogdill told authorities he was scared, never wanted to participate in the murder, and the murder and burglary were Bukowski's idea.

Cogdill's claim of duress was never contradicted. Additionally, Richard Wise, a former neighbor and fellow inmate of Bukowski's, testified outside the presence of the jury that Bukowski claimed he used a shotgun to force Cogdill to proceed with the murder. The State objected to Wise's testimony, arguing it constituted hearsay. The trial court sustained the State's objection and did not allow Wise to testify about what Bukowski allegedly said about the murder.

At the conclusion of the trial, the trial court submitted a jury charge instructing the jury to consider Cogdill's culpability as a principal, a party, and as a conspirator. The jury subsequently found Cogdill guilty of capital murder — murder in the course of a burglary or robbery[1] — and the judge sentenced him to a term of life imprisonment without the possibility of parole. Cogdill thereafter perfected this appeal.

## ANALYSIS

As noted above, Cogdill raises two issues on appeal. In his first issue, Cogdill contends his conviction should be overturned because the evidence is insufficient. With regard to his second

---

[1] The jury was instructed it could find Cogdill guilty of capital murder in the event he murdered Mr. Warren during the course of a robbery or during the course of a burglary of a habitation. As to each, the jury was instructed he could be found guilty as a principal, party, or conspirator.

issue, Cogdill contends the trial court erred in refusing to admit into evidence certain testimony excluded based on the State's hearsay exception.

## *Legal Sufficiency*

With regard to his sufficiency claim, Cogdill argues there is no evidence to establish he intentionally caused Mr. Warren's death during the course of a burglary or robbery, either alone or with others. He notes there is "no proof from any witness that [he] dealt the blow that killed Rick Warren . . . the testimony from the medical examiner was that there was no way of knowing the order that the wounds were inflicted or which was the deadly blow or blows." He further argues that because Milne admitted hitting Mr. Warren, the evidence is somehow insufficient as to his conviction. Cogdill also asserts his conviction must be overturned because there was no evidence to contradict his claim of duress, which relieves him of any responsibility for the murder.

### *Standard of Review*

When reviewing an appellant's challenge to the sufficiency of the evidence to support his conviction, "we view the evidence in the light most favorable to verdict to determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (quoting *Brooks v. State*, 323 S.W.3d 893, 902 n. 19 (Tex. Crim. App. 2010)); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As the trier of fact, "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury." *Montgomery*, 369 S.W.3d at 192; *see Rios v. State*, 230 S.W.3d 252, 255 (Tex. App.—Waco 2007, pet. ref'd). Our duty is merely to ensure the evidence supports the verdict. *Montgomery*, 369 S.W.3d at 192. Thus, even "[w]hen the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the

jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record."

*Id.*

*Application*

Under section 19.02(b)(1) of the Texas Penal Code, a person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02 (b)(1) (West 2011). The offense of murder is elevated to capital murder under section 19.03 of the Code if the murder is committed "in the course of committing or attempting to commit . . . burglary, robbery[.]" TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2014). In this case, the charge authorized the jury to convict appellant of capital murder: (1) as a principal, (2) as a party under section 7.02(a)(2) of the Texas Penal Code, or (3) as a conspirator under section 7.02(b) of the Penal Code. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), (b) (West 2011).

Whether as principal, party, or conspirator, the jury must find the defendant acted intentionally, though not necessarily with respect to the resultant murder itself, in order to convict. "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03 (a). When assessing a defendant's intent, "[i]t is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005).

*Cogdill's Culpability as Principal*

In his written statement, Cogdill admitted he agreed when Bukowski asked if he wanted to make some money. Cogdill agreed to break into Mr. Warren's trailer to steal property. Moreover, Cogdill knew the plan was to render Mr. Warren unconscious in the event he was awake when the three entered the trailer. Cogdill also acknowledged that he knew Bukowski and Milne had killed people in the past. He also conceded Milne broached the idea of "beating up" Mr. Warren, and

this idea came up before they left for the trailer house. Additionally, the trio took a large crescent wrench and a shotgun with them.

According to Cogdill, just before they arrived at the trailer, Bukowski told Cogdill they were going to kill Mr. Warren. Cogdill claimed in his interview, and in a proposed e-mail to the Cleburne Times Review, that he tried to back out, but Bukowski threatened to shoot him. After the trio entered the trailer, Milne gave Cogdill the wrench and Bukowski told them to go into the bedroom and "strike" Mr. Warren. Cogdill claimed in his videotaped interview that he dropped the wrench and left the trailer. For over an hour, he denied hitting Mr. Warren with the wrench or his fists. Cogdill told law enforcement Milne alone beat Mr. Warren with his fists and the wrench, despite Cogdill's pleas to stop. Cogdill specifically stated he was not in the room when Milne beat Mr. Warren and denied there was any blood on his clothing. Cogdill claimed that if there was blood on his clothing, it was transferred from Milne's clothing when Bukowski took their clothes and bundled them together.

However, after the investigating officers told Cogdill they had his proposed e-mail to the newspaper and information from Bukowski and Milne, Cogdill changed his story with regard to his involvement in the murder. He first admitted that when Mr. Warren woke up — while he was standing over him — he was startled and struck Mr. Warren on the shoulder or neck with the wrench, "but that was it." Then, upon further questioning Cogdill confessed to hitting Mr. Warren with the wrench more than once after he sat up. Cogdill maintained his blows could not have killed Mr. Warren; rather, it was Milne's blows that caused the death.

In his written statement, which was written after the videotaped interview, and in the e-mail to the newspaper, Cogdill stated he "hit" or "grazed" Mr. Warren's shoulder with the wrench, causing him to wake up. According to Cogdill's written statement, when Mr. Warren woke up Cogdill "swung" the wrench, hitting Mr. Warren in the head up to four times. Thereafter, he

dropped the wrench, which was picked up by Milne, who continued beating Mr. Warren. Cogdill admitted taking items from the trailer and placing them in the car. Thereafter, Cogdill stayed with Ringley for two days. He then stayed at a house in Dallas for approximately three days, finally returning to Waxahachie and turning himself in to authorities.

The State also introduced evidence showing that blood found on a t-shirt worn by Cogdill belonged to Mr. Warren. The t-shirt was found during a search of Bukowski's residence. Apparently, after Bukowski took Cogdill's and Milne's clothes, Bukowski kept them. Mr. Warren's blood was also found on a crescent wrench discovered in Bukowski's residence.

We hold a rational trier of fact could have concluded Cogdill, acting as principal, intentionally caused the death of Mr. Warren — a death caused during the commission of a burglary or robbery — by repeatedly bludgeoning Mr. Warren with a crescent wrench.

Cogdill contends that even if the evidence establishes he struck Mr. Warren, "there was no way of knowing which was the deadly blow or blows." This contention relates to the issue of causation, and we hold that it does not render the evidence insufficient to support the capital murder conviction.

Under section 6.04(a) of the Texas Penal Code, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone *or concurrently with another cause*, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a) (West 2011). Given Cogdill's statement about striking Mr. Warren with the crescent wrench a number of times, we cannot say "the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *See id.* In other words, we cannot say the blows delivered by Milne were sufficient to cause Mr. Warren's death and the blows of Cogdill were clearly insufficient to cause the death. *See id.* The jury could have rationally found that Mr. Warren's death would not

have occurred but for Cogdill's conduct as an actor, operating alone or concurrently with another party to the crime.

*Cogdill's Culpability as a Party*

Even if we were to hold the evidence was legally insufficient to prove Cogdill guilty of the offense as a principal, we hold the State nevertheless presented evidence sufficient for a rational trier of fact to find Cogdill guilty as a party to the offense. Section 7.01(a) of the Texas Penal Code provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). Subsection (b) provides that each party to the offense may be charged with the offense. *Id.* § 7.01(b). A person is "criminally responsible" for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

Cogdill's admissions establish his intent to assist in the offense. Before leaving for Mr. Warren's trailer, and before any alleged threats were made, Cogdill knew the trio was going to burglarize the trailer or commit a robbery in the event Mr. Warren was home. He also knew the plan included knocking Mr. Warren out in the event he was home and awake. Cogdill knew his companions had killed people in the past. He also knew weapons were placed in the vehicle.

As detailed above, Cogdill entered the bedroom with Milne, each standing beside the bed where Mr. Warren was sleeping. When Milne gave Cogdill the wrench, Cogdill struck Mr. Warren several times. Mr. Warren's blood was found on Cogdill's shirt. Cogdill admitted he was present when Milne beat Mr. Warren with his fists and then with the same wrench used by Cogdill.

The evidence noted above is legally sufficient to establish Cogdill's guilt in this case as a party. The jury could have concluded Cogdill's initial striking of Mr. Warren was in aid of the

robbery or burglary, as well as the murder. Although Cogdill consistently claimed Milne beat Mr. Warren to death, he admitted that he too struck Mr. Warren with the crescent wrench. Bludgeoning a person with a crescent wrench naturally assists a third party's murder of the same person when it occurs during the same event. Moreover, Cogdill admitted removing property belonging to Mr. Warren from the trailer and placing it in the vehicle used by the trio. Accordingly, we hold the jury could have found Cogdill aided Milne, "with intent to promote or assist the commission of the offense." *Id.*

### *Cogdill's Culpability as a Conspirator*

Finally, even if we determined the evidence was legally insufficient to find Cogdill guilty of the offense of capital murder as a principal or a party, the evidence was certainly sufficient to find him guilty of the offense as a conspirator. Section 7.02(b) of the Penal Code states: "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." *Id.* § 7.02(b). A person participates in a criminal conspiracy "if, with intent that a felony be committed: (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute an offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement." *Id.* § 15.02(a).

It is undisputed that Cogdill, Bukowski, and Milne agreed to burglarize Mr. Warren's trailer or rob Mr. Warren if he was home. In his interview with investigators, Cogdill even admitted the men intended to "knock" Mr. Warren out if he was awake or awoke during the burglary or robbery. In fact, in every version of events proffered by Cogdill, from the e-mail to his oral and written statements, Cogdill consistently admits he went with Bukowski and Milne to

Mr. Warren's trailer with the intent to commit a felony, i.e., to take property belonging to Mr. Warren. Cogdill did this despite knowledge that the other men had admittedly killed people in the past. He admitted the men brought weapons with them, admitted he and Milne struck Mr. Warren about the head and shoulders until he was dead, and admitted the three of them left with property stolen from the residence.

The laptop computer stolen from Mr. Warren's trailer was found in Bukowski's car, and the stolen television set and guitar were found in Bukowski's residence. And, as noted above, Cogdill's bloody t-shirt, containing Mr. Warren's blood, placed Cogdill at the scene of the crime.

Based on Cogdill's various admissions and the corresponding physical evidence, the jury may have reasonably believed Cogdill not only agreed and intended to engage in conduct constituting a felony offense, i.e. burglary, robbery, and perhaps assault, but also he and others performed overt acts in pursuance of the agreement: traveling to Mr. Warren's trailer, entering the trailer without permission, removing Mr. Warren's property from the trailer without permission, and striking Mr. Warren with fists and a crescent wrench. The jury could have rationally concluded one or more of the men murdered Mr. Warren in the course of committing the underlying felony of burglary or robbery by bludgeoning Mr. Warren with the crescent wrench. Because the murder of Mr. Warren was a foreseeable result of the plan agreed to by Cogdill — particularly given what he knew about his companions — a rational trier of fact could have could have found Cogdill guilty of capital murder as a conspirator. As a conspirator in the felony offenses of burglary or robbery, Cogdill was guilty of capital murder even if he did not intend to kill Mr. Warren. *See id.*

<u>Cogdill's Affirmative Defense of Duress</u>

Cogdill contends the evidence was sufficient to establish his affirmative defense of duress. Accordingly, the jury should not have found him guilty of the offense of capital murder. In support

of this contention, Cogdill argues that because the evidence of duress was uncontroverted, the jury had no choice but to find in his favor on this defensive issue. We disagree.

Duress is an affirmative defense that requires the defendant to prove he committed the offense "because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." *Id.* § 8.05(a). It is, on its face, a confession-and-avoidance or justification defense because it does not negate any element of the offense, including intent, but rather excuses what would otherwise constitute criminal conduct. *Rodriguez v. State*, 368 S.W.3d 821, 824 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see Walters v. State*, 247 S.W.3d 204, 209 n.20 (Tex. Crim. App. 2007) (noting duress is a defense to conviction). The defendant has the burden to prove duress by a preponderance of the evidence. *See* TEX. PENAL CODE ANN. § 2.04(d) (West 2011). We find there are two problems with Cogdill's duress argument.

First, it is black letter law that a defendant cannot establish that an act is justified without first admitting to the act itself. *Rodriguez*, 368 S.W.3d at 824. "A defendant's failure to testify, stipulate, or otherwise proffer defensive evidence admitting that he 'engaged in the proscribed conduct' prevents the defendant from benefitting from the defense of duress." *Id.* (citing *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007) (holding defendant is entitled to jury instruction on justification defense only when his defensive evidence essentially admits to every element of offense, including culpable mental state)). Here, Cogdill did not submit evidence that he committed the capital murder. Rather, Cogdill's admissions, such as they were, came from evidence introduced by the State. Although Cogdill attempted to introduce evidence from a cellmate of Bukowski's to establish Bukowski's threats, the evidence was excluded on hearsay grounds. Accordingly, Cogdill neither testified, stipulated, nor proffered defensive evidence admitting to his commission of the offense of capital murder. Accordingly, he was not entitled to a duress instruction in the first instance.

Second, even though Cogdill's claim that Bukowski threatened to kill him if he backed out or ran away — as set out in the evidence submitted by the State — was uncontroverted, the jury was not compelled to believe Cogdill. The only evidence that Bukowski threatened Cogdill with imminent death or serious bodily injury came from Cogdill himself. As set out in the standard of review, "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies." *Montgomery*, 369 S.W.3d at 192; *Rios*, 230 S.W.3d at 255. Moreover, the jury may choose to believe all, some, or none of the evidence presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Rios*, 230 S.W.3d at 255.

It is clear from Cogdill's various statements — the e-mail, the videotaped interview, the written statement — that his claims were fluid, changing when he was confronted with additional information or was subject to additional questions from authorities. It would have been completely rational for the jury to find his claim of duress unbelievable given that it appeared Cogdill's intent was to place himself in the best light possible under the circumstances. Accordingly, we hold the jury was entitled to disbelieve Cogdill's claims of duress — even if it believed other portions of his recorded and written statement. We therefore overrule Cogdill's contention regarding the defense of duress.

### *Hearsay*

In his hearsay issue, Cogdill argues the trial court erred in excluding testimony from Wise — a former neighbor of Bukowski's who ended up in a cell next to Bukowski after Bukowski was arrested for the murder of Mr. Warren — regarding Bukowski's claim that Bukowski used a shotgun to force Cogdill and Milne to murder Mr. Warren. Cogdill argues the evidence should not have been excluded based on the State's hearsay objection because the excluded statement was one showing Bukowski's state of mind and emotion, which is an exception to the hearsay rule. *See* TEX. R. EVID. 803(3). Again, we disagree.

- 13 -

### *Standard of Review*

A trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard of review. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *Kelley v. State*, 22 S.W.3d 642, 644 (Tex. App.—Waco 2000, pet. ref'd). A reviewing court will not reverse a trial court's ruling on the admissibility of evidence so long as it falls within the zone of reasonable disagreement. *Id.* We would err in applying the standard of review if we reversed a trial court's decision on admissibility of evidence solely because we disagreed with it. *Rodriguez*, 203 S.W.3d at 841.

### *Application*

Here, Cogdill sought to introduce evidence from one of Bukowski's cellmates, Wise. Bukowski was arrested the afternoon following the murder. At some point following his arrest, he shared a cell with Wise. According to Wise, at some point after his arrest, Bukowski told Wise he used a shotgun to force Cogdill and Milne to kill Mr. Warren. Cogdill sought to introduce the following testimony from Wise:

> Mr. Bukowski told me that the night that — that all three of them, they went out to the — to the guy's house. He said that — that at first he had told Mr. Cogdill and Mr. Isaac Milne that it was just to go out there to rob the guy of some laptops, some computer software, and some musical instruments and stuff. He said whenever they got there he said — he said the guy that they went to rob used to be an old roommate of his and said that he told them that the guy was a convicted pedophilier (sic), and whenever they got out there he pulled a shotgun from his trunk, he held it on Mr. Cogdill and Mr. Milne and forced them to proceed with the – with the murder.

The State objected to Wise's testimony, arguing it was hearsay. Cogdill asserted the statement was subject to an exception to the hearsay rule, specifically Rule 803(3) of the Texas Rules of Evidence. The trial court disagreed with Cogdill and sustained the State's objection. The jury never heard Wise's testimony.

"'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). Hearsay is inadmissible unless a statute or rule of evidence permits its admission. *Id.* R. 802. Rule 803(3), entitled "Then Existing Mental, Emotional, or Physical Condition," sets out one exception to the hearsay rule. *See id.* R. 803(3). Under this rule, "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)" is not hearsay. *Id.* However, this exception does not include "a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." *Id.*

Cogdill argued below, and argues here, that Wise's testimony was admissible under the exception set out in Rule 803(3) because Wise's testimony, "reveals Bukowski's state of mind and the hate involved with the offense." First, we disagree with Cogdill's interpretation of Bukowski's statement. The statements allegedly made by Bukowski are merely a rendition of the events that took place on the night of the murder, i.e., out-of-court statements of events that occurred, and as such are hearsay and not admissible under Rule 803(3). *See Barnum v. State*, 7 S.W.3d 782, 790–91 (Tex. App.—Amarillo 1999, pet. ref'd) (holding that written statement that "Today I found the attached paper. The paper with figures was written by my husband . . ." was not admissible under Rule 803(3) because it was merely a rendition of events that occurred).

Second, numerous courts have held that for the exception set forth in Rule 803(3) to apply, the statement must relate to future, not past, conduct. In *Glover v. State*, the defendant was convicted of aggravated sexual assault of a child. 102 S.W.3d 754, 758 (Tex. App.—Texarkana 2002, pet. ref'd). The evidence showed the defendant, who was twenty-six, had sexual relations with the fourteen-year-old victim. *Id.* On appeal, the defendant complained about the introduction of certain testimony over his hearsay objection. *Id.* at 761.

During trial, the State sought to introduce testimony from a mother regarding statements her daughter allegedly made during a confrontation regarding the daughter's relationship with the defendant. *Id.* 761–62. When the defendant objected, the State argued, among other things, that the testimony was admissible under Rule 803(3), and the trial court agreed. *Id.* at 762. On appeal, the court of appeals disagreed, holding the mother's statements about what her daughter told her — I snuck out of the house, he picked me up last Sunday, he took me to his apartment, we had sex, we danced, we listened to music, we had sex on the floor, we used a condom — were merely a description of past facts, seeking to prove the defendant and the daughter had sexual relations. *Id.* The court held that evidence that seeks merely to establish a remembered fact is specifically excluded from the state of mind exception set out in Rule 803(3). *Id.* Moreover, the court held that to the extent the statements implicated the defendant's intent, plan, motive, etc., they related to past conduct, not future conduct, as required for Rule 803(3) to apply. *Id.* at 762–63 (citing *Jones v. State*, 515 S.W.2d 126, 129 (Tex. Crim. App. 1974) (holding hearsay inadmissible under state of mind exception because statement did not reflect intent or motive for future action, but only discussed preceding events)); *see also Hernandez v. State*, 171 S.W.3d 347, 356 (Tex. App.— Houston [14th Dist.] 2005, pet. ref'd). Accordingly, the appellate court held the trial court erred in admitting the statements based on Rule 803(3). *Glover*, 102 S.W.3d at 763.

Wise's testimony relating Bukowski's statements is no different than that of the mother in *Glover*. His testimony describes statements allegedly made by Bukowski concerning actions allegedly undertaken by Bukowski in the past, not any future actions. As such, they are not admissible under the state of mind exception of Rule 803(3). Accordingly, we hold the trial court did not err in refusing to admit Wise's testimony.

**CONCLUSION**

Based on the foregoing, we overrule Cogdill's issues on appeal and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish